2023 IL App (1st) 220038-U

No. 1-22-0038

Second Division
May 23, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 17 CR 14870 |
| v. | ) ) | |
| LUIS NAJERA, | ) ) | Honorable |
| Defendant-Appellant. | ) ) | Angela Munari Petrone, Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We find that the trial court did not violate defendant's right to counsel of his choice where private counsel was not ready, willing or able to make an unconditional entry of appearance on defendant's behalf.

¶ 2     Following a jury trial, defendant-appellant Luis Najera was found guilty of predatory sexual assault of a child and aggravated sexual abuse and sentenced to consecutive terms of 30 years, 10 years, 6 years, and 3 years. On direct appeal, defendant argues that he is entitled to a new

trial because the trial court abused its discretion in denying him his choice of counsel. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In October 2017, a grand jury charged defendant with four counts of predatory sexual assault of a child and four counts of aggravated sexual abuse for sexually molesting G.C., aged 12 at the time, between June 1 and September 1, 2017. The State proceeded on three counts of predatory sexual assault (counts 2-4) and one count of aggravated sexual abuse (count 8).

¶ 5     On October 23, 2017, Frank Kostouros entered his appearance as private counsel for defendant.

¶ 6     On June 7, 2018, Kostouros informed the court that the State made a plea offer but, after conferring with defendant, he requested a Rule 402 conference with the court. When the court asked defendant whether he wanted the Rule 402 conference, defendant responded that he had not spoken to Kostouros that day and did not know how to answer. The trial court held the conference and set a date for defendant to respond to the offer.

¶ 7     On July 20, 2018, the following exchange occurred:

"KOSTOUROS: Judge, my client informed me that he no longer wishes me to represent him.

THE COURT: Is that true?

DEFENDANT: Yes.

THE COURT: Did you hire another lawyer?

DEFENDANT: Not yet.

THE COURT: How long is it going to take you to hire another lawyer?

DEFENDANT: Can you give me one from here until I get another one?

\*\*\*

THE COURT: Are you asking for a public defender?

DEFENDANT: Yes. Until I get another one.

THE COURT: No. No. We don't go back and forth lawyers, private, public defender, private. It doesn't work like that. \*\*\* If you really don't want Mr. Kostouros to represent you and you have the money to hire another lawyer[,] I will give you a reasonable amount of time to do that. If you are planning on hiring your own private attorney, then I'm not going to just throw in the public defender for good measure until you hire your own lawyer. \*\*\* Mr. Najera, do you have the financial means now --- since you've been in custody for so long, do you actually have the money to hire another lawyer?

\*\*\*

DEFENDANT: I do not have money. I just don't want him anymore and I want him to return my money."

The court stated that it would not get involved in defendant's financial issues with Kostouros but again confirmed that defendant did not want to be represented by him. Kostouros informed the court that he had no issues with representing defendant but he believed that defendant was unhappy with the plea offer and wanted an offer below the minimum despite informing defendant of the possible penalties and the sentencing range. The court stated that it was going to grant a short continuance to allow defendant to decide whether he wanted to keep Kostouros as his lawyer, hire a new one, or be appointed a public defender.

¶ 8    On August 8, 2018, defendant again stated that he did not want Kostouros to represent him and he requested a public defender. Defendant explained that Kostouros did not come to see him at the jail and he had not been shown any evidence against him. Kostouros responded that he had spoken with defendant at every court appearance with the assistance of a court interpreter and that defendant is well aware of the evidence against him, including the pending DNA results. The court noted that it was reasonable for Kostouros to speak with defendant at court appearances because he would not have an interpreter at the jail and he does not speak Spanish. The court found that Kostouros was not ineffective in representing defendant. Patrick White from the public defender's office was appointed as counsel for defendant.

¶ 9    Over the next six months, White filed a number of motions on defendant's behalf, including motions for discovery, to suppress statements, to quash the arrest, and to compel the translation of defendant's videorecorded interview. On December 7, 2018, White informed the court that defendant was insisting that "we didn't get everything done" but White stated that they had reviewed the video, the complaints, and the reports, with the court's interpreter.

¶ 10   On March 27, 2019, Tiesha Smith replaced White as defendant's appointed counsel. No reason was given for the change in counsel.

¶ 11   On June 25, 2019, David Roleck appeared as appointed counsel for defendant. Again, no reason was given for the change in counsel. That same day, the State filed a motion to admit hearsay statements pursuant to section 115-10 (725 ILCS 5/115-10 (West 2018)).

¶ 12   On September 9, 2019, Roleck informed the court that defendant did not wish to accept the offer given following the Rule 402 conference.

¶ 13    On October 10, 2019, Domingo Vargas, a private attorney, appeared before the court. The court acknowledged that Roleck was defendant's current counsel and inquired as to the reason for Vargas's presence. The following exchange occurred:

"VARGAS: For the record again[,] Domingo Vargas. Seeking leave to file my appearance on behalf of [defendant]. Let me give you a little background. We were in contact with his family and friends and they wanted me to inquire whether or not the court would allow me to come in as a new lawyer. Again[,] we didn't know the status as to what position the case was in. That's basically what we told them. We haven't signed an official agreement. They paid for my presence here, for my time.

THE COURT: I understand what you're saying. I'll tell you that the case came into the system in October of 2017. Initially there was one private attorney[,] Frank Kostouros. He represented your client from that date, October 2017, all the way to August of 2018. Almost a full year. That was after [defendant] rejected and revoked a reduced offer. Curry admonishments were given. Mr. Kostouros withdrew and public defender was appointed. [Defendant] was working with the assistant public defender Pat White, gave more dates, went through all the evidence, paternity results were tendered. Mr. White filed a motion to compel translation of electronic recorded interrogation, compelling translation was denied. He was given numerous dates to work on translation. There was fetal tissue that was compared. Then Mr. Najera didn't want Mr. White anymore. He got *** several continuances for private counsel. Then another public defender Miss Smith came on the case. She's with the defendant for several months. Up until approximately July, up until June of this year and then Mr. Roleck has represented the defendant. So this defendant has *** gone through numerous attorneys, private and public defenders. He didn't want the

offer, made and rejected a long, long time ago. And we're past the case management deadline for disposal of the case. That's the posture we are in now. You would be at least the fourth or fifth attorney on the case.

VARGAS: Got it.

\*\*\*

THE COURT: I will add back on September 9 again an offer was made and another offer was rejected. And revoked. So that's the posture of the case. I respect you very much as a lawyer. If you're ready to do the 115-10 hearing, I certainly would let you file your appearance.

VARGAS: Again, coming in and it's an old case as well as I spoken [*sic*] to their family, that's why I was here to inquire \*\*\* what the posture of the case was. I'm not in a position not knowing any of the facts, details. I cannot do that. That's probably why I'm going to have to relay to the family that I'm not in a position since it's gone so far."

Vargas left the courtroom to attend to one of his cases, and the section 115-10 hearing began.

¶ 14    At the section 115-10 hearing, G.C.'s mother and a forensic interviewer from the Chicago Children's Advocacy Center provided testimony, which included G.C.'s statements to them that defendant inappropriately touched her and forced her to have sexual intercourse with him. The court ruled that the mother's statement was inadmissible but the interviewer's statement was admissible.

¶ 15    After several continuances, on December 18, 2019, the jury trial was set for March 17, 2020.

¶ 16    On March 10, 2020, "Mr. Vasquez" appeared before the court.[1] The following exchange occurred:

"VASQUEZ: Yes. I have not yet filed an appearance in this case. I'm here because [defendant] has represented to me that even though he knows he is on the eve of trial he has had difficulty communicating with counsel and he would like me to come in on the case in order to either negotiate a plea or go to trial.

THE COURT: [Defendant's] case is three years old. It's set for jury March 17th. If you're ready to go to jury March 17th, you can file an appearance. This has been going on and on with [defendant]. He's gone through several different [attorneys]. Now on the eve of trial[,] he wants to make another switch. I will let you switch if you're ready for trial on March 17th.

VASQUEZ: I cannot say that I would be ready on March 17th."

¶ 17    The court provided a summary of the history of the proceedings in defendant's case. The court stated that it found defendant's tactics to be "dilatory." The court stated that the request to file an appearance would be denied unless Vasquez could be ready to go to trial. A discussion was had regarding resetting the date for trial. Vasquez stepped back up, and the court asked whether he could be ready for trial in a couple of months. Vasquez responded, "I could definitely not be ready in a [week's] span. I could possibly be ready in a couple of months span. Yes." The court allowed the case to be continued until May 5 and informed Vasquez that he could file an appearance if he could be ready by then but the court would not grant any further continuances

---

[1] Mr. Vasquez's first name does not appear in the record.

because of defendant's delaying tactics. The court set a status date to allow Vasquez time to review discovery and decide whether he would be filing an appearance as defendant's counsel.

¶ 18    On March 17, 2020, the Illinois Supreme Court entered an order in response to the COVID-19 pandemic. Ill. S. Ct., M.R. 30370 (eff. March 17, 2020). That order suspended all court proceedings except for essential or emergency matters. On March 20, 2020, the Illinois Supreme Court entered another order, which stated "[i]n the case of criminal proceedings, any delay resulting from this emergency continuance order shall not be attributable to either the State or the defendant for purposes of section 103-5 of the Code of Criminal Procedure of 1963." Ill. S. Ct., M.R. 30370 (eff. March 20, 2020). On April 3, 2020, the supreme court amended its order allowing trials to be continued until further order of the court. Ill. S. Ct., M.R. 30370 (eff. April 3, 2020).

¶ 19    On March 13, 2020, the Chief Judge of the Circuit Court of Cook County, Timothy Evans, ordered that all matters in the circuit court were rescheduled and continued for a period of 30 days. Cir. Ct. Cook Cty. G.A.O 2020-01 (eff. March 17, 2020). As a result of further orders, all jury trials were suspended until March 22, 2021. Cir. Ct. Cook Cty. G.A.O. 2020-02 (eff. July 6, 2020, eff. Sept. 3, 2020, eff. Oct. 16, 2020); Cir. Ct. Cook Cty. G.A.O. 2020-07 (eff. Nov. 23, 2020, eff. March 23, 2021).

¶ 20    Pursuant to these court orders, defendant's jury trial was continued and ultimately commenced on October 1, 2021. Because this appeal does not involve any factual issues from the trial, we summarize the evidence presented as follows.

¶ 21    G.C., who was 17 years old at the time of trial, testified that during the summer of 2017 she was 12 years old and lived with her two sisters and her mother, Angelica Lopez. During that time, Lopez was dating defendant and they had a child together. G.C. testified that defendant would come over during the week when her mother was home, but he would also come over on most

Saturdays when her mother was at work because he was doing some work on the home. G.C. stated that, on those Saturdays, defendant would take her into the basement where there was a couch, instruct her to lay down on the couch, and then touch her. She specified that defendant would touch her breasts with his hands and his mouth, over and under her clothes. She testified that, on multiple occasions, "his bottom part touched her bottom part," which she indicated as his penis and her vaginal area, and she specified that his "bottom part" was "moving" inside of her. He also put his fingers inside her "bottom part" under her clothes. He did not take her clothes off but would reach under them or pull her clothes "down a little bit." Afterwards, defendant would instruct her not to tell anyone and sometimes he would give her money.

¶ 22    Towards the end of the summer, G.C. began to experience stomach pain and headaches. Lopez took her to St. Anthony's Hospital and the doctor conducted an ultrasound, which confirmed that G.C. was pregnant. On September 9, 2017, Lopez took G.C. to another medical clinic where G.C. underwent an abortion procedure. G.C. testified that the reason why she needed an abortion was because she "was a small age."

¶ 23    Lopez, G.C.'s mother, testified that she was in a romantic relationship with defendant and during the summer of 2017, he would visit the home while she was at work, stating that he was doing work on the home. When G.C. began to complain of stomach pain and headaches towards the end of the summer, she took her to the emergency room at St. Anthony's Hospital. There, she learned that G.C. was pregnant. On September 9, 2017, Lopez took G.C. to the Michigan Avenue Center for Health, where an abortion procedure was performed.

¶ 24    Pearl Griffin, a registered nurse at Michigan Avenue Center for Health, testified that, on September 9, 2017, G.C. underwent an abortion procedure, and afterwards, the fetal tissue from the procedure was provided to a Chicago police detective.

¶ 25    Elizabeth Perez testified that she was previously employed as a forensic interviewer with the Chicago Children's Advocacy Center. On September 11, 2017, she interviewed G.C. Chicago police detective Carrie Iser and Assistant State's Attorney Rachel Mabbott were present for the interview on the other side of a two-way mirror. The videorecorded forensic interview was published to the jury.

¶ 26    Jennifer Serdiuk, a nurse at St. Anthony's Hospital, testified that, on September 4, 2017, she treated G.C., who was complaining of abdominal pains. After conducting a number of tests, hospital personnel confirmed that G.C. was pregnant. The ultrasound showed that the fetus was eight weeks and four days old.

¶ 27    Serdiuk testified that she spoke with G.C. about the results outside the presence of Lopez and G.C. eventually informed her that defendant forced her to have sexual intercourse with him on Saturdays while her mother was at work. The hospital notified the police and the Department of Child and Family Services.

¶ 28    Forensic experts with the Illinois State Police forensic lab developed DNA profiles from G.C. and defendant's buccal swabs and the fetal tissue. Based on those profiles, it was determined that the biological probability of defendant's parentage was 99.999 percent as compared to an untested, unrelated man.

¶ 29    Following closing arguments, the jury found defendant guilty of counts 2, 3, and 4 for predatory sexual assault of a child and count 8 for aggravated sexual abuse.

¶ 30    On November 5, 2021, Roleck filed defendant's amended motion for a new trial. The motion challenged the trial court's denial of defendant's October 10, 2019, "request for a continuance for Vargas to file an appearance" and the trial court's denial of Vasquez's March 10,

2020, request for leave to file an appearance. The trial court denied the motion. In so ruling, the court stated:

"Regarding the assertion that on October 10th, 2019 prior to the 115-10 hearing the defendant asked for a continuance for private attorney to appear and I denied him having the private attorney. I'm quite perplexed by that because this case didn't go to jury until [mid-2021]. The defendant had years after that to bring in a private attorney and he did not do so, nor did any private attorney ever tell this Court that they were --- wanted to file an appearance and I said no you can't."

¶ 31    At the sentencing hearing, the State submitted victim impact statements from G.C. and Lopez. In allocution, defendant stated, through an interpreter:

"I want an appeal. I want an appeal. I want all the copies of what has been done since the beginning to be sent to me. I want a copy of the complaint and the True Bill and sorry for everything. I'm not the person that they're accusing me of being and I ask you for a chance and that's it."

¶ 32    The trial court sentenced defendant to consecutive prison terms of 30 years, 10 years, and 6 years on three counts of predatory criminal sexual assault of a child and a consecutive term of 3 years' imprisonment for one count of aggravated criminal sexual abuse.

¶ 33    Defendant filed a motion to reconsider his sentence, which the trial court denied.

¶ 34    This appeal followed.

¶ 35                                II. ANALYSIS

¶ 36    Defendant's sole claim on appeal is that his sixth amendment right to counsel was violated. In particular, he asserts that the trial court abused its discretion by failing to adequately inquire

into Vargas's request to represent defendant at the section 115-10 hearing and in denying Vargas leave to represent defendant at the hearing.

¶ 37    We first address whether defendant forfeited this claim, as the State contends. The State argues that defendant failed to preserve this claim for review by not making a contemporaneous objection before the trial court, although it was included in his posttrial motion. See *People v. Reese*, 2017 IL 120011, ¶ 60 (a defendant must make a contemporaneous objection and raise the objection in a posttrial motion to preserve the claim). We agree with the State; defendant forfeited review of the issue by failing to make a contemporaneous objection. The State also points out that defendant did not request plain error review in his opening brief. However, defendant requested plain error review in his reply brief, and as such, we find the request properly before us. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010).

¶ 38    The plain error rule is "a narrow exception to forfeiture principles designed to protect the defendant's rights and the reputation of the judicial process." *People v. Moon*, 2022 IL 125959, ¶ 21. Under the plain error rule, reviewing courts have discretion to review forfeited errors under two alternative prongs: "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* ¶ 20. The burden is on the defendant to establish either prong. *Id.*

¶ 39    Errors falling under the second prong are "presumptively prejudicial errors—errors that may not have affected the outcome, but must still be remedied" because they deprive the defendant of a fair trial. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). Stated another way, "[p]rejudice to

the defendant is presumed because of the importance of the right" and the strength of the evidence presented at trial is not a consideration. *Id.* at 187. The error defendant alleges here is violation of his right to counsel of his choice.

¶ 40    Under the sixth amendment of the United States Constitution, as well as the Illinois Constitution, a criminal defendant is entitled to the assistance of counsel. U.S. Const., amend VI; Ill. Const. 1970, art. I, § 8. This includes the right to retained counsel of choice. *People v. Jenkins*, 2020 IL App (1st) 172422, ¶ 12. "Whether a defendant's right to counsel was violated does not depend on whether the defendant received a fair trial or was prejudiced by his or her representation at trial." *Id.*; see also *People v. Adams*, 2016 IL App (1st) 141135, ¶ 15 ("So fundamental is a defendant's right to a counsel of his or her choosing that its erroneous denial requires automatic reversal of a conviction without regard to harmless-error or prejudice analysis."). Our supreme court has held that "[v]iolations of the right to counsel of choice are structural errors[,]" (*People v. Baez*, 241 Ill. 2d 44, 105 (2011)).  The court has also equated "the second prong of plain-error review with structural error," because both such errors require "automatic reversal[.]" *People v. Moon*, 2022 IL 125959, ¶ 28. Therefore, a violation of a defendant's right to counsel of choice qualifies under the second prong of plain error review.

¶ 41    Because the challenged error before us does not require a showing of prejudice, the only issue before us is whether the trial court committed a clear and obvious error regarding defendant's right to counsel of choice.

¶ 42    "It is within the trial court's discretion to determine whether the defendant's right to selection of counsel unduly interferes with the orderly process of judicial determination." *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008). Therefore, we review the trial court's decision for abuse of discretion. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000). "An abuse of discretion

occurs when the trial court's decision can be characterized as 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *People v. Smith*, 2022 IL 127946, ¶ 47 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37).

¶ 43     Defendants cannot use the constitutional right to counsel of one's choice as "a weapon" in order to "thwart the administration of justice, or to otherwise embarrass the effective prosecution of crime." *People v. Friedman*, 19 Ill. 2d 341, 349 (1980). A trial court considering a request for a continuance to retain counsel or to substitute counsel "must balance [the] defendant's constitutional right against the interests in trying the case efficiently." *People v. Staple*, 402 Ill. App. 3d 1098, 1103 (2010). The factors this court should consider in evaluating the trial court's decision include "the diligence of the movant, the right of the defendant to a speedy, fair and impartial trial, and the interests of justice." *Segoviano*, 189 Ill. 2d at 245. Other factors reviewing courts have considered include whether the defendant articulates an acceptable reason for desiring new counsel; whether the defendant has continuously been in custody; whether the defendant has informed the trial court of their efforts to obtain counsel; whether the defendant has cooperated with current counsel; and the length of time the defendant has been represented by current counsel. *People v. Childress*, 276 Ill. App. 3d 402, 411 (1995). The trial court will not be found to have abused its discretion in the absence of substitute counsel who stands ready, willing, and able to make an unconditional entry of appearance. *Segoviano*, 189 Ill. 2d at 245. "[I]f any of those requirements is lacking, a denial of the motion is not an abuse of discretion." *People v. Ramsey*, 2018 IL App (2d) 151071, ¶ 25. Finally, we note that our determination turns on the particular facts of each case. *Tucker*, 382 Ill. App. 3d at 920.

¶ 44     We have examined the record of proceedings in this matter closely, including the trial court's posture on the occasion of defendant's release of private attorney Kostouros and his later

expressed intent to retain attorney Vasquez. For the reasons that follow, we conclude that the trial court did not commit a clear and obvious error with respect to the appearance of attorney Vargas.

¶ 45    The record shows that on October 10, 2019, the parties were prepared to proceed with the section 115-10 hearing and two witnesses were present and ready to give their testimony. Vargas, a private attorney, approached the bench. He stated that defendant's family and friends had paid for his appearance that day to inquire whether the trial court would allow him to represent defendant. He informed them that he would find out the status of the case. He had not been retained to represent defendant at that point. The court provided a detailed history of the case, which included explaining that defendant originally had a private attorney, who he dismissed, and defendant had also been represented by a number of public defenders. The court also stated that defendant had previously been given continuances to retain private counsel. The State informed the court that the witnesses were present, the DNA testing had been completed, and they were ready for the hearing. The court then informed Vargas that if he was ready to proceed to the hearing that day, the court would let him file an appearance.

¶ 46    Vargas responded that he understood that the case had progressed "so far" and that "it's an old case." He further stated that he had spoken to the family, and "that's why [he] was here to inquire *** what the posture of the case was." He did not know the "facts, details" of the case and he stated that he would not be able to represent defendant during the hearing. Finally, he stated: "That's probably why I'm going to have to relay to the family that I'm not in a position since it's gone so far."

¶ 47    Vargas left the courtroom, and his name does not appear in the record again after that day. The hearing proceeded with Roleck representing defendant. Following the hearing, the trial court

ruled that the forensic interviewer hearsay statements were admissible but not the mother's hearsay statements.

¶ 48     Based on our review, it does not appear that Vargas was "ready, willing, and able" to appear on defendant's behalf on the date of the section 115-10 hearing. Although not dispositive, at the time Vargas appeared in court, he had not yet been retained either by defendant or the friends at whose request he appeared. Further, the record does not suggest that Vargas had had any prior meetings or discussions with defendant or with counsel of record. He initially stated that he had come to file his appearance, but then he commented that his purpose in being in court that day was to inquire regarding the posture of the case—to see if he could come in "as a new lawyer." He additionally stated that the case had "gone so far" and that he was not familiar with the facts. We believe that it was for that reason that Vargas expressed his intent to tell defendant's family of his inability to proceed with representation of defendant, not that the court had denied him the opportunity to file an appearance. In our view, Vargas was not foreclosed from filing an appearance in the case.  Rather, the court offered that if he was ready to proceed with the previously set section 115-10 hearing, he would be permitted to file his appearance. In response, Vargas simply asserted his unfamiliarity with the case and departed, requesting neither a recess to attempt to familiarize himself with the case, nor a continuance. On this record, and based on Vargas's own statements, it is clear that on the date of his appearance in these proceedings, he was neither willing nor ready to represent defendant. See *Segoviano*, 189 Ill. 2d at 245 (holding that the trial court did not abuse its discretion where there was no showing that substitute counsel had been secured and there was no averment that such substitute counsel was ready and willing to enter an appearance); *People v. Spurlark*, 67 Ill. App. 3d 186, 198-99 (1978) (counsel was not ready and willing where he was not immediately available to try the defendant's case and he conditioned his representation

on a 30-day continuance). Accordingly, because the requirements for substitution of counsel were not fulfilled, we can find no abuse of discretion in the court's "denial" of Vargas's "request to file an appearance." See *Koss*, 52 Ill. App. 3d at 607-08 (stating that if any requirement is lacking, a denial of the motion is not an abuse of discretion).

¶ 49    We find this court's decisions in *People v. Curry*, 2013 IL App (4th) 120724, and *People v. Ramsey*, 2018 IL App (2d) 151071, instructive.

¶ 50    In *Curry*, the defendant had been represented by attorney Mark Harmon for several months. A week before the trial date, Harmon learned that the defendant had hired another attorney, Richard Frazier, to represent him. 2013 IL App (4th) 120724, ¶¶ 9-11. Harmon filed a motion on the day of trial to continue the case in order to inquire into the defendant's intentions going forward. *Id.* ¶ 11. Harmon later informed the court that the defendant wanted Frazier to represent him at trial, the defendant had paid a retainer for Frazier's representation, and Frazier was conditioning his appearance on Harmon securing a continuance. *Id.* ¶¶ 12-13. The trial court rejected this request for a continuance and did not allow the substitution of counsel. *Id.* ¶ 15. On appeal, the Fourth District of this court affirmed the trial court's decision because the court's inquiry revealed that Frazier was not ready, willing, and able to make an unconditional appearance. *Id.* ¶¶ 51-52.

¶ 51    In *Ramsey*, the defendant was originally represented by a private attorney who withdrew early on. 2018 IL App (2d) 151071, ¶ 3. The defendant hired new counsel and was given a continuance. Subsequently, that attorney also withdrew and a public defender was appointed. There were a number of continuances as well as a number of court dates where the defendant did not appear. The defendant attempted to retain private counsel again when the trial was continued for a scheduling conflict, but he failed to do so. *Id.* On the day of the defendant's bench trial, his

public defender informed the court that the defendant wanted a private attorney, with whom the public defender had been in contact. *Id.* ¶ 4. The attorney had informed the public defender that he was willing and able to take the case, but he could go to trial in two weeks, not on that day. *Id.* The trial court recited the history of the case and denied the request for a continuance. *Id.* ¶ 5. On appeal, the Second District of this court noted that substitute counsel's appearance was conditioned on a continuance and therefore, counsel was not ready, willing, and able to enter an appearance. *Id.* ¶ 28. For that reason, the court held that the trial court did not abuse its discretion in denying the request for substitution of counsel. *Id.* ¶ 30.

¶ 52    In both cases, substitute counsel's appearance on the defendant's behalf was specifically conditioned on a continuance. Here, Vargas did not make any conditions on his representation of defendant; he simply did not pursue representation of defendant after learning the posture of the case. Neither, by the way, did he attempt to acquaint himself with any of the facts of the case in order to pursue representation. As such, like in *Ramsey* and *Curry*, substitute counsel was not ready and willing to make an unconditional appearance on defendant's behalf and thus, there was no abuse of discretion.

¶ 53    Nonetheless, in support of his argument that the court abused its discretion, defendant points to the trial court's inaccurate recollection of defendant's various counsel changes. The record showed that, in explaining the history of the case to Vargas, the trial court stated:

> "Then Mr. Najera didn't want Mr. White anymore. He got *** several continuances for private counsel. Then another public defender Miss Smith came on the case. She's with the defendant for several months. Up until approximately July, up until June of this year and then Mr. Roleck has represented the defendant. So this defendant has *** gone through numerous attorneys, private and public defenders."

¶ 54    It is true that the record does not support the court's statement that defendant no longer wanted White to represent him. Additionally, the court's continuance allowing defendant to retain private counsel was granted prior to White's appointment. However, we do not believe that the court's minor error in reciting the timeline of events affected Vargas's decision not to proceed with representation of defendant, nor did it render the court's response regarding Vargas's appearance unreasonable or arbitrary. Notably, even before the court's recitation of the procedural history of the case, Vargas commented that he "didn't know the status as to what position the case was in." A statement, we would add, likely prompted the court's recitation.

¶ 55    The court accurately noted that defendant had previously been represented by private counsel, had been appointed several different public defenders, had turned down plea offers, and the case had proceeded long past the case management stage. As such, defendant's contention does not alter our conclusion that Vargas was neither willing nor ready to proceed and that the trial court did not, therefore, abuse its discretion.

¶ 56    Defendant also asserts that the trial court's posttrial insinuation that defendant's right to counsel could not have been violated because there was a year delay before defendant's jury trial occurred is not relevant to our disposition. We agree. The court's comment appears to have focused on defendant's rights at trial. Clearly the issue before us is whether defendant was entitled to representation of his choice during any phase of the proceedings. We do not dispute that he was. That, however, does not change the fact that at the time Vargas appeared, he was not then ready, willing, or able to represent defendant in these proceedings.

¶ 57    We understand defendant's assertion that the court's denial appears more unreasonable because the request occurred long before trial. Were we able to conclude that the ultimate purpose for Vargas's presence in court on October 10 was to file an appearance, as opposed to inquire

concerning the procedural posture of the case, we might agree. But that is not what this record shows. Any request to file an appearance was clearly abandoned, not because of the court's denial, but instead, because of counsel's unreadiness.

¶ 58 Finally, we reject defendant's reliance on *People v. Jenkins*, 2020 IL App (1st) 172422, as we find it distinguishable on its facts.

¶ 59 In *Jenkins*, the defendant was appointed counsel at his arraignment and a few months later, the court held a Rule 402 conference. 2020 IL App (1st) 172422, ¶¶ 3-4. The trial court gave the defendant no time to consider the offer, which the defendant effectively denied. *Id.* ¶ 4. Five weeks later, on the day of trial, a private attorney appeared in court on defendant's behalf and sought leave to file his appearance. *Id.* ¶ 5. The court informed the private attorney that he could only file his appearance if he was ready to proceed to trial that day, to which he responded that he could not. *Id.* The court denied the request to substitute counsel, and appointed counsel represented defendant during the bench trial. *Id.* ¶ 6.

¶ 60 On appeal, the defendant claimed that the trial court violated his right to counsel of his choice. *Id.* ¶ 11. This court found that the trial court abused its discretion in disallowing the defendant his counsel of choice and reversed and remanded for a new trial. *Id.* ¶¶ 15, 23. The court stated that, although counsel was not prepared to proceed to trial that day, the trial court's "failure to make further inquiry into [the defendant's] request outweigh[ed] that consideration." *Id.* ¶ 16. Specifically, "[t]he trial court made no inquiry into how long [counsel] required to prepare for trial, [the] defendant's reasons for wanting new counsel, the efforts [the defendant] made to retain private counsel and when, or whether he had been cooperative with his assistant public defender." *Id.* The court further noted that the defendant had identified his preferred attorney, who was present in court and ready, willing, and able to file an appearance on the defendant's behalf, the case had

only been pending for five months, the defendant had not previously sought to substitute counsel, and the trial had never been continued. *Id.* ¶ 15.

¶ 61 Although in *Jenkins* and the case before us, private counsel was present in court, the other circumstances resulting in this court's decision in *Jenkins* are clearly distinguishable from those in this case. In particular, here, defendant's case had been pending for two years prior to the section 115-10 hearing. By that time, defendant had been represented by both private counsel and appointed counsel. Defendant had previously been given time to retain private counsel and had rejected a number of plea offers. Significantly, on the date Vargas was present in court, he had been sent, not by defendant, but instead by defendant's family and friends. He did not represent that he was willing and able to represent defendant, commented regarding how far along the case had already proceeded, and did not press for either a recess or a continuance. Instead, having initially commented that he was present to file his appearance, he subsequently offered that defendant's "family and friends" wanted him to inquire whether the court would permit him to come in as a new lawyer. To that end, he stated, "We didn't know the status as to what position the case was in." Clearly, Vargas's purpose in being there was to inquire concerning the present posture of the case and having done so, elected not to proceed. Not knowing the status of the case, he could not possibly have been prepared to proceed. For these reasons, we find *Jenkins* inapposite.

¶ 62 Despite these factual differences, defendant asserts that the *Jenkins* court's reasoning regarding the trial court's lack of inquiry into the defendant's request to substitute counsel is equally applicable here. He specifically argues that we should find that the court abused its discretion in failing to learn how long Vargas would need to prepare for the hearing, defendant's reasons for desiring new counsel, the efforts defendant made to retain new counsel, and whether defendant had been cooperative with Roleck. Citing to *Tucker* and similar cases, he contends that

"[i]t is well established that the judge's failure to make these inquiries, on its own, constitutes an abuse of discretion and warrants reversal." See *People v. Green*, 42 Ill. 2d 555 (1969) (reversed because the trial court did not make "any inquiry into the truth of the circumstances described by the defendant" regarding privately retained counsel).

¶ 63    Although Vargas initially asserted that his presence in court was to file an appearance, it became clear rather quickly that he was there instead to gauge the posture of the proceedings. Never once did he assert a readiness to proceed, neither at the time he stood before the bench nor anytime thereafter. Had he done so, we could perhaps agree, as defendant suggests, that further inquiry by the court would be warranted.

¶ 64    At oral argument, the holding in *Tucker* served as the focal point of defendant's argument in support of reversal. Thus, we provide the salient facts of *Tucker*, which like *Jenkins*, we find distinguishable. In *Tucker*, on the day of trial, the defendant informed the court that he had hired new counsel and identified him by name. *Tucker*, 382 Ill. App. 3d 918-19. The trial court refused to continue the trial, noting that the named counsel was not present in court and this was the third trial date. *Id.* On appeal, this court held that the trial court's inquiry was insufficient where it did not ask the defendant why he wanted different counsel, whether he had actually "hired" new counsel, or whether he could afford private counsel. *Id.* at 923. Further, the reviewing court was concerned with the trial court's failure to consult with the defendant's family and to contact the named counsel to determine whether he was ready, willing, and able to represent the defendant. *Id.* There were also no findings that the defendant's request was a delay tactic and was not made in good faith. *Id.* at 924. As such, this court concluded that the trial court abused its discretion in denying the defendant's motion for a continuance to substitute counsel. *Id.* at 924.

¶ 1　　Again, the posture taken by Vargas at the time of his October appearance differs significantly from that of the attorneys in *Jenkins* and *Tucker*. In neither of those cases does the substituting attorney appear in court merely to inquire concerning the posture of the case. Neither do any of those attorneys comment regarding their lack of knowledge of the facts of the case. Moreover, at the time Vargas appeared in court, he gave no indication that his presence in court had been at defendant's urging. Vargas stated to the court that he appeared at the request of defendant's family and friends who had paid him for one day to check the status of the case and to see if he could "come in as a new lawyer." Finally, this case differs from *Tucker*, where the defendant in that case expressly requested a change in counsel and informed the court that he had been in contact with new counsel. 382 Ill. App. 3d at 318-19. In contrast, defendant made no such request here and there was no suggestion that he had any direct contact with Vargas.

¶ 2　　In sum, in the case before us, there was no unequivocal request for substitution of counsel and Vargas did not appear ready, willing, and able to file an appearance on the date he appeared before the court.　Accordingly, we are not persuaded that the manner in which the trial court proceeded in regard to Vargas's presence in court on the date of the section 115-10 hearing amounted to an abuse of discretion. See *Wheat v. United States*, 486 U.S. 153, 159 (1988) "[A] defendant may not insist on representation by an attorney *** who for other reasons declines to represent the defendant.").

¶ 3　　Because no clear and obvious error occurred in the trial court's decision, defendant cannot establish plain error.

¶ 4　　　　　　　　　　　　　　III. CONCLUSION

¶ 5　　For the reasons stated, we affirm the judgment of the circuit court.

¶ 6　　Affirmed.